UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| PATRICK FINN and LIGHTHOUSE MANAGEMENT GROUP, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL NO. 2:11cv159 ) |
| CENTIER BANK, and PEOPLES BANK SB, | ) ) |
| Defendants. | ) |

OPINION AND ORDER

This matter is before the court on a motion for partial summary judgment filed by one of the defendants, Peoples Bank SB ("Peoples"), on June 7, 2011. On August 12, 2011, the Plaintiffs, Lighthouse Management Group, Inc., as Receiver for First United Funding, LLC, filed their response, to which Peoples replied on August 26, 2011.

For the following reasons, the motion for partial summary judgment will be granted.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly

supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

Discussion

Plaintiffs have sued in their capacity as the Receiver for First United Funding ("FUF") and its principal, Corey N. Johnston. (Compl. ¶ 11.) Plaintiffs allege that FUF conducted a Ponzi scheme, and they have asserted four (4) counts against Peoples, all designed to recover the profits that Peoples allegedly earned through its transactions with FUF. (Compl. ¶ 6.) Specifically, Plaintiffs allege that FUF and Johnston (1) oversold interests in loans issued to third parties; (2) sold interests in loans that did not exist; and (3) engaged in other unidentified fraudulent conduct. (Compl. ¶ 4.)

The Complaint describes how FUF and Johnston issued loans to borrowers in exchange for promissory notes and other assurances of payment, including the granting of security interests and guaranties. (Compl. ¶ 16.) FUF then sold "participation interests" in these loans to banks and other financial institutions. Id.

The sale of "participation interests" is common in the banking industry. (Affidavit of Todd Scheub at ¶ 5.) In such a sale, a lender like FUF originates a loan to a third party borrower (the "Borrower"). (Scheub Aff. ¶ 5.) The lender then sells "participation interests" in that loan to banks and other financial institutions, while retaining the right to service the loans in exchange for a fee. (Scheub Aff. ¶ 5.) The original lender can either sell the entire loan – a 100% participation interest – or some portion of the loan. (Scheub Aff. ¶ 5.) If the lender sells 100% of its interest in the loan, except for any relatively small portion of the interest retained as a servicer

fee, the original lender no longer has any ownership interest in the loan, and it eliminates entirely any risk of loss associated with a subsequent default by the Borrower.

The Plaintiffs allege that FUF's sales of participation interests were part of a Ponzi scheme. See, e.g., Compl. ¶¶ 1 and 5. "Generally, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." In re Bonham, 229 F.3d 750, 759 n.1 (9th Cir. 2000). To establish a Ponzi scheme, one must establish "'that 1) deposits were made by investors; 2) the Debtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new investors.'" Armstrong v. Collins, No. 01 Civ. 2437, 2010 U.S. Dist. LEXIS 28075, at *69-*70 (S.D.N.Y. Mar. 24, 2010) (quoting Forman v. Salzano (In re Norvergence, Inc.), 405 B.R. 709, 730 (Bankr. D. N.J. 2009)).

In the present case, the Plaintiffs allege that FUF oversold participation interests and sold participation interests in fictitious loans, using the proceeds to pay profits to the banks that invested earlier. (Compl. ¶¶ 4, 17-18, 25.) Plaintiffs also allege that FUF commingled the funds transferred between FUF and the various participants and that FUF did not maintain any system to track the cash transfers. (Compl. ¶¶ 22-23.)

In September 2009, two participants in FUF's loans commenced litigation in Minnesota and asked the court to appoint a receiver. (Compl. ¶ 30.) The Minnesota court found that FUF had oversold certain loan participations and was unable to account for payments from the underlying borrowers. (Compl. Exh. F at 6, ¶¶ 26-27.) The court appointed Plaintiff Lighthouse

Management Group, Inc. as the Receiver for FUF on October 23, 2009, and authorized it to manage and control FUF's assets, including its loan participation agreements. (Compl. ¶ 31 and Exh. F at 7.) The court subsequently expanded the scope of the Plaintiffs' authority on December 3, 2009, and February 5, 2010, to include, among other things, the authority to "[i]nvestigate and pursue any and all claims that First United or the Receiver may have against any third party, including but not limited to, fraudulent transfer and illegal distribution claims." (Compl. ¶¶ 32-33; Compl. Exh. G; Compl. Exh. H at 5, ¶ 4.i.)

The Plaintiffs have asserted four counts against Peoples – three under the Uniform Fraudulent Transfer Act ("UFTA") and one for unjust enrichment. (Compl. ¶¶ 51-86.) Peoples is alleged to have been a participant in two FUF loans: the Moyes Loan and the Moyes Children's Limited Partnership Loan. Peoples is seeking partial summary judgment only with respect to the Moyes Loan. The Plaintiffs do not allege that the Moyes Loan was fake, that Peoples acted in bad faith, or that Peoples was complicit in FUF's alleged fraudulent activities.

Peoples asserts that the following facts are undisputed. Peoples Bank is a state bank organized under the laws of Indiana. (Scheub Aff. ¶ 3.) It has twelve branches – eleven in Lake County, Indiana, and one in Porter County, Indiana. (Scheub Aff. ¶ 3.)

In 2004, Peoples was approached by FUF about purchasing participation interests in a $5 million loan issued by FUF to Jerry and Vickie Moyes (the "Moyes"), a married couple who lived in Arizona. (Scheub Aff. ¶ 6.) On October 29, 2004, FUF and Peoples executed a Participation Agreement (the "2004 Participation Agreement") under which Peoples purchased a 100% participation interest in the Moyes Loan. (Scheub Aff. ¶ 7 and Exh. A.) On November 22, 2004, Peoples Bank wired $5 million (minus $2,500 for legal fees) to FUF to acquire its 100%

interest in the Moyes Loan. (Scheub Aff. ¶ 10 and Exh. A; Compl. ¶¶ 44 and 46.)

The original Moyes Loan was memorialized in a Loan Agreement and a Promissory Note (the "2004 Note"), each dated October 29, 2004. (Scheub Aff. Exh. C and D.) The 2004 Note provided for repayment of the $5 million principal plus interest calculated at a rate equal to 2% plus the Prime Rate. (Scheub Aff. Exh. D.) The Moyes were required to pay monthly installments of accrued interest on the loan starting November 30, 2004. (Scheub Aff. Exh. D.) The balance of the principal and any unpaid accrued interest were due on the Maturity Date, which was originally November 30, 2005. (Scheub Aff. Exh. D.) The parties subsequently modified the original 2004 Note on two occasions to extend the Maturity Date and to decrease the interest rate. (Scheub Aff. Exh. E and F.)

The 2004 Participation Agreement makes clear that FUF sold its interest in the Moyes Loan to Peoples Bank and that the parties' relationship was that of a buyer and a seller:

> **2.1 Sale and Purchase.** Lender [FUF] hereby sells and Participant [Peoples Bank] hereby purchases an undivided interest in and to the Loan and in the Collateral and in the Collections in an amount equal to Participant's Maximum Principal Amount of Participation. Such sale and purchase shall be effective and this Agreement shall take effect as of the later of the date of this Agreement or receipt by Lender of Participant's Maximum Principal Amount of Participation . . . .
>
> **2.2 Relationship to Parties.** The relationship between Lender and Participant is and shall be that of a seller and purchaser of a property interest (i.e., an outright, absolute partial assignment of an undivided interest in and to the Loan, in the Collateral and in the Collections) and not a creditor-debtor relationship.

(Scheub Aff. Exh. A, ¶¶ 2.1 and 2.2.)

Although FUF sold 100% of the Moyes Loan to Peoples, FUF remained responsible for administering and servicing the loan on Peoples' behalf. (Scheub Aff. Exh. A ¶¶ 4.1 and 4.4.) Thus, FUF continued as the "nominal" payee on the Moyes note; it continued as the "nominal" beneficiary of the guaranty; and it continued as the "nominal" secured party under the loan documents. (Scheub Aff. Exh. A, ¶ 2.2.) The Participation Agreement expressly stated that FUF was to hold all of these interests as an agent of Peoples Bank and not on its own behalf:

> Participant [Peoples] hereby approves of and authorizes Lender [FUF] to be named as the nominal payee of the Note and nominal beneficiary of each Guaranty and the nominal secured party under the Loan Documents, and, subject to the provisions of this Agreement, to generally act as agent for all Participants in the holding and disposition of the Collateral. Lender agrees that Lender holds the security interests and other interests granted by the Note and the Loan Documents not in its individual capacity but rather as agent for Participants in accordance with this Agreement.

(Scheub Aff. Exh. A, ¶ 2.2.)

As the administrator and servicer of the Moyes Loan, FUF was responsible for collecting all loan payments from the Moyes and remitting those payments to Peoples Bank by wire transfer within 3 business days of their receipt. (Scheub Aff. Exh. A, ¶¶ 4.1 and 4.4.) Section 4.4 also provided that, "[u]ntil remitted to Participant, Lender [would] hold Participant's share of all Collections." (Scheub Aff. Exh. A, ¶ 4.4.) FUF was required to "segregate from its own funds Participant's share of Collections actually received and maintain separate, internal records with respect to Participant's share of the Loan." (Scheub Aff. Exh. A, ¶ 4.4.)

After purchasing the Moyes Loan, Peoples Bank began receiving the monthly interest

6

payments required by the 2004 Note and Participation Agreement. (Scheub Aff. ¶ 15.) The payments were sent by wire transfer and received by Peoples Bank in Indiana. (Scheub Aff. ¶ 16.) Attached to the Scheub Affidavit as Exhibit G is a document showing one of the wires received from FUF on the Moyes Loan. (Scheub Aff. ¶ 16 and Exh. G.) Exhibit G shows that the wire received by Peoples listed Jerry Moyes as the beneficiary and included the account number for the Moyes Loan. (Scheub Aff. ¶ 16 and Exh. G.) Plaintiffs do not specifically allege that any of the payments came from any other source, and Peoples does not have any information suggesting that they did. To the contrary, according to documents filed with the Securities and Exchange Commission, Jerry Moyes and related entities acquired Swift Transportation Co., Inc. in a deal for approximately $3.6 billion on May 10, 2007. (Scheub Aff. ¶ 18 and Exh. H.) The next day, Peoples received a $5,000,000 wire transfer for application to the Moyes Loan. (Scheub Aff. ¶ 17.) Then, on May 14, 2007, Peoples received the final $51,250 payment of accrued interest. (Scheub Aff. ¶ 17.)

There is no real dispute that FUF was involved in a Ponzi scheme. The question before the court is whether the Moyes Loan was tainted by the Ponzi scheme such that the Receiver is entitled to recover from Peoples the profit from the loan.

The Plaintiffs have provided the following facts regarding the Ponzi scheme. Corey Johnston is a resident of Minnesota, and controlled FUF, which previously operated under the name Fahnestock Funding, LLC. (Allen Decl. ¶ 2.) On August 6, 2010, the United States Attorney's Office charged Johnston "with operating a $80 million Ponzi scheme with bank money." (Id. ¶ 3, Exs. A and B.)

On September 2, 2010, Johnston pleaded guilty. (Id. ¶ 4, Exs. C, D, E.) As part of his

7

guilty plea, Johnston admitted that he used FUF to engage in a scheme to defraud banks through the overselling of loan participations. (Id., Ex. C ¶¶ 1(2)-1(3), 1(5), 1(10).) Johnston admitted to fraudulently obtaining over $79 million from lenders and using that money to continue overselling loan participations—a classic Ponzi scheme. (Id., Ex. C ¶¶ 1(3), 1(10).) On April 28, 2011, Johnston was sentenced to 6 years in prison. (Allen Decl. ¶ 5.)

On October 23, 2009, the Minnesota State Court for Dakota County appointed Plaintiff Patrick Finn and Lighthouse Management Group, Inc. as Receiver of FUF. (Allen Decl. ¶ 6, Ex. F.) Subsequent to the appointment, the Minnesota State Court expanded the receivership to include Johnston's non-exempt assets. (Allen Decl. ¶ 7, Ex. G.) Among other things, the Court authorized the Receiver to "[i]nvestigate and pursue any and all claims that First United or the Receiver may have against any third party, including but not limited to, fraudulent transfer and illegal distribution claims." (Id. ¶ 8, Ex. H at p. 5.)

To carry out the Ponzi scheme FUF and Johnston loaned funds (or purported to loan funds) to borrowers in exchange for promissory notes and other assurances of payment, including the granting of security interests in collateral and guarantees. (Allen Decl. ¶ 9.) The promissory notes and related loan documents were between the borrower and FUF. (Id.)

FUF then entered into Participation Agreements with banks (the "Participants"), whereby the Participants purchased a percentage of a promissory note. (Id.) Johnston and FUF began the Ponzi scheme involving FUF's loan participations by at least 2002. (Allen Decl. ¶¶ 10-13.) Johnston sold participation interests that exceeded the loan amounts, sold purported participations in counterfeit loans, sold participations in underfunded loans, and other similar fraudulent activity. (Id. at ¶ 11.) To engage in these fraudulent transactions, Johnston and FUF

8

presented false documents and information to the Participants. (Id. at ¶ 12.) Johnston forged borrower's signatures, cut and pasted or otherwise appended borrower's signatures to loan documents that were false, and altered bank statements and other financial documents purportedly presented by borrowers. (Id.) Johnston used the funds fraudulently obtained from Participants to pay back Participants in the Ponzi scheme so as to perpetuate the scheme and to fund his lavish lifestyle. (Allen Decl. ¶¶ 4, 17, Ex. C ¶ 1(10); Ex. D at pp. 21-24; Ex. E.)

The transfers between FUF and the Participants were commingled and flowed through FUF's bank accounts. (Allen Decl. ¶ 14.) Since 2002, FUF engaged in over 12,000 transfers, totaling over $1.6 billion. (Id.) The vast majority of these transfers occurred in FUF's Wells Fargo account in Minneapolis, Minnesota. (Id.) FUF maintained no system to track the over $1.6 billion in transfers. (Id.)

According to the Plaintiffs, the commingling of funds in FUF's common accounts (the "common accounts") was central to the implementation and ongoing maintenance of the Ponzi scheme. (Id. ¶ 16.) By pooling Participant funds and borrower payments in FUF's common accounts, FUF and Johnston were able to perpetuate the Ponzi scheme by making payments to Peoples Bank and other Participants in the Ponzi scheme, even when no loan existed. (Id.) By the very nature of the fraudulent scheme, FUF and Johnston were insolvent during the entire period of his criminal enterprise. (Id. ¶ 15.)

In support of its motion for partial summary judgment, Peoples argues that it purchased 100% of the Moyes loan for reasonably equivalent value, and it thereafter owned all money collected from the Moyes on that loan and thus none of the payments Peoples received on the Moyes loan were fraudulent transfers.

A transfer of assets is not avoidable under the UFTA if it was supported by reasonably equivalent value. Specifically, the UFTA defines three types of transfers as fraudulent with respect to present and/or future creditors:

(1) Section 14(1) applies to transfers made with the actual intent to hinder, delay or defraud a creditor;

(2) Section 14(2) applies to transfers for which no reasonably equivalent value was received and the transferor either had unreasonably small assets remaining or the transfer resulted in the transferor¡|s being unable to pay debts when due; and

(3) Section 15 applies to transfers for which no reasonably equivalent value was received and the transferor was either insolvent or became insolvent as a result of the transfer.

Ind. Code §§ 32-18-2-14 and 32-18-2-15.

Sections 14(2) and 15 expressly state that the transferor must not have received "reasonably equivalent" value in order for the transfer to be fraudulent. Ind. Code §§ 32-18-2-14(2) and 32-18-2-15. Section 14(1) does not refer to any such requirement, but a subsequent section of the UFTA provides that a transfer is not avoidable under Section 14(1) against "a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." Ind. Code § 32-18-2-18.

Thus, if a transferee provides reasonably equivalent value for the property, a transfer is not avoidable under the UFTA, unless there is evidence of bad faith. "The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to

what was received." Barber Golden Seed Co., Inc., 129 F.3d 382, 387 (7th Cir. 1997). The Seventh Circuit has explained that "the formula for determining reasonably equivalent value is not a fixed mathematical formula; rather, the standard for '[r]easonable equivalence should depend on all the facts of each case,' an important element of which is fair market value." Id. (quoting In re Bundles, 856 F.2d 815, 824 (7th Cir. 1988)). The transferee (Peoples) bears the burden of establishing that it received the transfer in good faith and for reasonably equivalent value." Ind. Code §§ 32-18-2-14(1).

In the present case, the Plaintiffs do not allege that Peoples obtained the Moyes Loan for less than reasonably equivalent value. It is undisputed that the loan to the Moyes was for $5 million, and Peoples Bank paid $5 million to acquire it. Nor do the plaintiffs allege that Peoples acted in bad faith. Thus Peoples concludes that its acquisition of this loan was not fraudulent under the UFTA, and it cannot be avoided.

Because Plaintiffs cannot challenge Peoples' purchase of the Moyes Loan, Plaintiffs focus on the subsequent payments of interest and principal to Peoples Bank and allege that these subsequent payments were fraudulent transfers under the UFTA. (See, e.g., Compl. ¶¶ 45-50.) But Peoples argues that these claims also fail because FUF's transfer of property owned by Peoples cannot qualify as fraudulent transfers of FUF's assets.

According to Peoples, all payments Peoples received after acquiring the Moyes Loans were represented as payments from the borrowers on those loans. (Scheub Aff. ¶ 16 and 19.) The wires showed Jerry Moyes as the beneficiary and identified the account number for the payments as the account for the Moyes Loan. (Scheub Aff. ¶¶ 16 and Exh. G.) Peoples states that it is not aware of any evidence that these payments came from any other source. (Scheub Aff. ¶ 19.)

11

Peoples further contends that because it owned a 100% interest in the Moyes Loan, all collections FUF received on that loan belonged to Peoples. The parties' Loan Participation Agreement made this point explicit:

(1)  FUF sold its interest in the Loan and the Collections (. 2.1);

(2)  FUF agreed to hold the interest granted under the Note as Peoples'| agent, not in its individual capacity (. 2.2);

(3)  FUF agreed to hold the Peoples share of the Collections(i.e., 100%) until they could be remitted to Peoples, which was required to occur within three (3) days of their receipt (. 4.4); and

(4)  FUF agreed to segregate Peoples' share of the Collections from FUF's funds (.4.5).

(Scheub Aff. Exh. A.) Paragraph 2.2 also states that FUF was only the "nominal" payee on the note and other loan documents. (Scheub Aff. Exh. A, . 2.2.) "Nominal" means "existing in name only." Black's Law Dictionary (9th ed. 2009). People's maintains that each of the above provisions demonstrates that Peoples, not FUF, owned all Collections on the Moyes Loan from the time they were made, even when in FUF's possession as Peoples' agent.

Assets held by an entity in trust for the benefit of another are not "assets" of that entity. See Dunham v. Kisak, 192 F.3d 1104, 1109 (7th Cir. 1999) ("The transfer of a property interest that the debtor holds in trust for another person will not qualify [as a transfer of the debtor's property]."); Matter of Maple Mortg., Inc., 81 F.3d 592, 595 (5th Cir. 1996) (holding that transfer by debtor of funds obtained in purchase of mortgage servicing rights were not recoverable by trustee as fraudulent transfer because debtor had only legal title to funds and no equitable interest

in them; debtor found to be holding funds for those to whom money was owed); In re Chase & Sanborn Corp., 813 F.2d 1177, 1182 (11th Cir. 1987) (monies held in corporate account did not give corporation interest in funds where they were in fact controlled by an individual). See also Kummet v. Thielen, 298 N.W. 245, 247 (Minn. 1941) ("A transfer of property to the true owner by one who has the bare legal title is not fraudulent as to the latter's creditors.").

Peoples argues that because all Collections received on the Moyes Loan belonged to Peoples, FUF did not engage in a "transfer" of its assets when it sent this property to Peoples. The UFTA only allows creditors to avoid certain "transfers." Ind. Code §§ 32-18-2-14 and 32-18-2-15. A "transfer" is defined as "any mode of disposing of or parting with an asset or an interest in an asset . . . ." Ind. Code § 32-18-2-10. And an "asset" means "property of a debtor." Ind. Code § 32-18-2-2(a). "Assets" under the UFTA do not – and cannot – include property that belongs to someone other than the entity alleged to have fraudulently conveyed its property.

Peoples further argues that the fact that Plaintiffs allege that all collections from borrowers were commingled into a single account does not change this analysis. Any money received by FUF on the Moyes Loan belonged to Peoples, regardless of whether it was commingled with other funds or not. And when FUF then wired funds from that account to Peoples, it was merely transmitting Peoples' property to it.

In response, the Plaintiffs contend that Peoples did not own 100% of the Moyes loan. The plaintiffs represent that FUF also sold an 80% interest in the Moyes Loan to State Bank Financial. However, this purported transfer occurred three months <u>after</u> selling the loan to Peoples. It is clear that the second sale was a fraud, as FUF did not own any interest in the Moyes Loan at that point to sell. This court agrees with Peoples that the fact that another bank

13

may have been defrauded into thinking it acquired an asset that it didn't acquire has no effect on Peoples' ownership interest. It is also clear that pursuant to the Loan Participation Agreement, all collections received on the Moyes Loan belonged to Peoples and FUF did not engage in a "transfer" of its assets when it sent the collections to Peoples.

The Plaintiffs continue to argue that Peoples did not provide reasonably equivalent value for the profits (interest) from the Moyes loan. The plaintiffs rely on a string of cases which hold that contracts with a Ponzi schemer are void as against public policy to the extent they would give a party a contractual right to profits. The Plaintiffs assert that Peoples should not be permitted to benefit from the Ponzi scheme at the expense of other victims. However, as Peoples points out, the cases relied upon by the Plaintiffs still used the reasonably equivalent value test. In the present case, it is clear that the Plaintiffs have conceded that Peoples paid reasonably equivalent value for the Moyes Loan. And this sale of the Moyes Loan to Peoples was the only asset transfer from FUF to Peoples. All other payments from FUF to Peoples were payments of the collections on that loan to Peoples – collections that Peoples already owned.

The cases relied upon by the plaintiffs are also distinguishable because in the present case, Peoples is not attempting to retain payments based on some contractual right to profits under its agreement with FUF. Rather, Peoples is entitled to retain the payments it received from the Moyes as the 100% owner of the Moyes Loan. As the plaintiffs conceded in their brief "[t]here was no contractual guarantee of repayment by FUF or Johnston to Peoples Bank. The explicit terms of the Participation Agreement provide that Peoples Bank accepts the risk of nonpayment." (Opposition brief at 9.)

The Plaintiffs also argue that the evidence in this case shows that the funds paid to

14

Peoples were collections obtained and controlled by FUF and were never segregated. According to the plaintiffs, due to the commingling of funds with funds obtained from other participant banks, they belonged to FUF and not to Peoples. However, the Plaintiffs are ignoring the fact that FUF was obligated to hold the Moyes collections in trust for Peoples. Under Indiana law, these contractual undertakings were sufficient to create a valid trust. Ind. Code § 30-4-2-1 ("Except as required in the applicable probate law for the execution of wills, no formal language is required to create a trust, but its terms must be sufficiently definite so that the trust property, the identity of the trustee, the nature of the trustee's interest, the identity of the beneficiary, the nature of the beneficiary's interest and the purpose of the trust may be ascertained with reasonable certainty.")

The Plaintiffs assert that there is no evidence that the profits Peoples received actually came from the Moyes. However, the evidence shows that in a letter dated June 13, 2011, the Plaintiffs' counsel admitted that the Moyes paid approximately 6.2 million on the Moyes Loan – the same amount then paid by FUF to Peoples. In relevant part, the Plaintiffs' counsel wrote: "the borrower paid... approximately $6.2 million to First United Funding, LLC, First United Funding, LLC paid approximately ... $6.2 million to Peoples Bank SB...." (Murray AFF. ¶¶ 3-4 and Exh. A.)

This letter is consistent with the evidence submitted by Peoples, i.e., wire transfer documents showing that the beneficiary of the payments was Jerry Moyes and the account number for the payments was that for the Moyes Loan. This court agrees with Peoples that because the undisputed evidence shows that the underlying borrowers - the Moyes - paid the 6.2 million that FUF then sent to Peoples and because Peoples owned these funds, the Plaintiffs have

no claim on these funds.

This evidence also defeats the Plaintiffs' unjust enrichment claim with respect to the Moyes Loan. There is simply no evidence that Peoples received stolen money. Although the plaintiffs use the term "Ponzi scheme" more than 50 times in their opposition brief, the existence of a Ponzi scheme does not relieve the Plaintiffs of the burden of presenting rebuttal evidence. As there is no evidence that Peoples benefitted from the Ponzi scheme, Peoples will be granted summary judgment on the unjust enrichment claim also.

## Conclusion

On the basis of the foregoing, partial summary judgment is hereby GRANTED to Peoples on the Moyes Loan claim.

Entered: September 12, 2011.

s/ William C. Lee  
William C. Lee, Judge  
United States District Court